**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

| | | |
|---|---|---|
| **CONSOLIDATED COMMUNICATIONS OF NORTHERN NEW ENGLAND COMPANY, LLC d/b/a FIDIUM,**<br><br>Plaintiff,<br><br>v.<br><br>**SOMERSET TELEPHONE COMPANY, HAMPDEN TELEPHONE COMPANY, THE ISLAND TELEPHONE COMPANY, WARREN TELEPHONE COMPANY, THE WEST PENOBSCOT TELEPHONE AND TELEGRAPH COMPANY, HARTLAND AND ST. ALBANS TELEPHONE COMPANY, COBBOSSEECONTEE TELEPHONE COMPANY, AND TDS TELECOMMUNUCATIONS LLC**<br><br>Defendants. | ) | Civil Action No. ____________<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff Consolidated Communications of Northern New England Company, LLC d/b/a Fidium ("Fidium"), by and through its undersigned counsel, brings this Complaint against Defendants Somerset Telephone Company, Hampden Telephone Company, The Island Telephone Company, Warren Telephone Company, The West Penobscot Telephone and Telegraph Company, Hartland and St. Albans Telephone Company, and Cobbosseecontee Telephone Company (collectively, the "TDS Operating Company Defendants"), and TDS Telecommunications, LLC ("TDS", and together with the TDS Operating Company Defendants, "Defendants") and allege as follows:

## NATURE OF THE ACTION

1. This is an action by Plaintiff to collect unpaid charges for federally regulated special access/business data services and interstate and intrastate switched access services owed by Defendants under Plaintiff's lawfully filed federal and state tariffs and published service guides.

2. Defendants also utilized Plaintiff's legacy landline network, switches, central office nodes, and trunking infrastructure to carry its customers' voice, data and other telecommunications traffic.

3. The rates, terms, and conditions of service governing Plaintiff's jurisdictionally interstate switched access services are set forth in federal tariffs filed with the Federal Communications Commission ("FCC"). Those tariffs have "deemed lawful" status under Section 204(a)(3) of the Communications Act of 1934, as amended (the "Communications Act"). The rates, terms, and conditions of service governing Plaintiff's jurisdictionally intrastate switched access services are set forth in tariffs filed with the Maine Public Utilities Commission ("Maine PUC"). Under the Filed Rate Doctrine, Defendants are legally obligated to pay the rates set forth in Plaintiff's publicly filed tariffs for tariffed services included therein.

4. A substantial majority of the amounts owed by Defendants involve interstate special access services — known since 2017 as business data services ("BDS") — that are jurisdictionally interstate and regulated by the FCC under Title II of the Communications Act. BDS is furnished over dedicated, point-to-point DS1, DS3 and other high-capacity facilities in Maine that are connected to TDS's points of presence for TDS's exclusive use. Fidium billed those services at the rates, terms and conditions published in the Fidium Business Data Services Catalog, Service Guide No. 3 ("Service Guide No. 3"). At all times relevant to this action, Service Guide No. 3 stated, "By ordering, continuing to use, and/or paying for a Special Access service listed in this catalog in the territory covered by this Catalog, Customer agrees that the rates, terms and

conditions of this Catalog shall govern Customer's ordering and use and Customer obligations, including payment obligations."

5. Despite regularly receiving and benefiting from Fidium's services and facilities, Defendants have systematically failed and refused to pay Plaintiff's invoices. Defendants have not paid Fidium anything for these services. As of September 1, 2026, Defendants owed Fidium $2,856,074.71 for special access/BDS service billed to Maine billing account numbers and $2,604,368.34 for switched access service billed to Maine billing account numbers, for a total of $5,460,443.05, exclusive of late payment charges and interest. Across Maine, New Hampshire and Vermont, Defendants unpaid balance to Fidium is approximately $9,356,914, as follows:

| State | SW/SP | Current (AUG Billing) | Past Due |
|---|---|---|---|
| ME | SP | $72,118 | $2,783,957 |
| ME | SW | $38,783 | $2,565,585 |
| NH | SP | $40,031 | $2,383,036 |
| NH | SW | $12,998 | $753,345 |
| VT | SP | $0 | $365,555 |
| VT | SW | $7,181 | $334,326 |
| **GRAND TOTAL** | | **$171,110** | **$9,185,804** |
| SP = Special Access Services | | | |
| SW = Switched Access Services | | | |
| | **Total** | **$9,356,914** | |

6. This action seeks recovery of, and is focused from a factual recitation standpoint on, the Maine-based TDS Operating Company Defendants and Maine billing account balances as set forth herein. Generally, but particularly as to TDS, Fidium reserves all rights as to the New Hampshire and Vermont balances, and reserves the right to recover the full amount set forth in this paragraph 5 from TDS.

7. On April 7, 2026, Fidium served Defendants, through TDS, with a Notice of Default and Opportunity to Cure (the "April 7 Notice").

8. TDS did not respond and failed to cure. Although the April 7 Notice advised TDS and the Defendants that all services were subject to suspension for non-payment, Fidium elected not to suspend the services while TDS was afforded an opportunity to transition its traffic in an orderly manner. Fidium continued to furnish the services in good faith, without waiver of and with full reservation of its rights —without receiving a single dollar — through July 7, 2026, for all but two BDS circuits in Maine (which Fidium terminated on July 7) and through September 1, 2026, for the remaining BDS and switched access circuits.

9. Fidium brings this action to recover the amounts the Defendants owe for services they ordered, accepted, used and refused to pay for, together with late payment charges, interest, costs, attorneys' fees, and a declaration of the parties' rights and obligations.

**PARTIES**

10. Plaintiff Consolidated Communications of Northern New England Company, LLC, doing business as Fidium, is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business at 2116 S. 17th St Mattoon, Illinois 61938. Fidium is the successor in interest to Northern New England Telephone Operations, LLC and certain affiliated entities operating in Maine that were formerly owned by FairPoint Communications, Inc. ("FairPoint"). Fidium, on behalf of itself and its affiliates, holds the claims that are the subject of this action.

11. Defendant Somerset Telephone Company is a Maine corporation that serves as a rural local exchange carrier with a place of business at 2 Elm Street, North Anson, Maine 04958, and a principal place of business in Madison, Wisconsin, and is a subsidiary of TDS Telecommunications LLC. ("Somerset").

12. Defendant Hampden Telephone Company is a Maine corporation that serves as a local rural exchange carrier with a place of business at 35 Western Avenue, Hampden Maine,

04444 and a principal place of business in Chicago, Illinois, and is a subsidiary of TDS Telecommunications LLC. ("Hampden").

13. Defendant The Island Telephone Company is a Maine corporation that serves as a local rural exchange carrier with a place of business at 451 Atlantic Road, Swans Island, Maine 04685, and a principal place of business in Madison, Wisconsin, and is a subsidiary of TDS Telecommunications LLC. ("Island").

14. Defendant Warren Telephone Company is a Maine corporation that serves as a local rural exchange carrier with a place of business at 99 Union Street, Warren, Maine 04864, and a principal place of business in Madison, Wisconsin, and is a subsidiary of TDS Telecommunications LLC. ("Warren").

15. Defendant The West Penobscot Telephone and Telegraph Company is a Maine corporation that serves as a local rural exchange carrier with a place of business at 20 Stetson Road Corinna, Maine 04928, and a principal place of business in Madison, Wisconsin, and is a subsidiary of TDS Telecommunications LLC. ("West Penobscot").

16. Defendant Hartland and St. Albans Telephone Company is a Maine corporation that serves as a local rural exchange carrier with a place of business at 65 Elm St, Hartland, Maine 04943, and a principal place of business in Madison, Wisconsin, and is a subsidiary of TDS Telecommunications LLC ("Hartland").

17. Defendant Cobbosseecontee Telephone Company is a Maine corporation that serves as a local rural exchange carrier with a place of business at 250 Collins Mills Road, West Gardner, Maine 04345, and a principal place of business in Madison, Wisconsin, and is a subsidiary of TDS Telecommunications LLC ("Cobbosseecontee").

18. TDS is a Delaware limited liability company with a principal place of business in Madison, Wisconsin. TDS is named a Defendant in this action principally because of the agency relationship between itself and the TDS Operating Company Defendants which on information and belief exists. In the alternatives, to the extent that TDS and not the TDS Operating Company Defendants is the real party in interest with respect to the amounts sought herein, TDS is named directly.

19. Fidium is a telecommunications carrier within the meaning of 47 U.S.C. § 153(51) and a common carrier within the meaning of 47 U.S.C. § 153(11), and it furnishes interstate telecommunications services subject to Title II of the Communications Act.

20. The TDS Operating Company Defendants are incumbent local exchange carriers located, doing business in and certificated in Maine and operate as subsidiaries of TDS, and are each a telecommunications carrier within the meaning of 47 U.S.C. § 153(51) and a common carrier within the meaning of 47 U.S.C. § 153(11), and furnish interstate telecommunications services subject to Title II of the Communications Act.

21. Upon information and belief, TDS ordered, managed, received, contested and directed the non-payment of the Fidium services at issue as agent on behalf of each TDS Operating Company Defendant or, in the alternative, on its own behalf. Each TDS Operating Company Defendant acted through, and its telecommunications operations are managed and directed by TDS.

## JURISDICTION AND VENUE

22. This Court has federal question jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Plaintiff's claims arise under the Communications Act of 1934, as amended, 47 U.S.C. §§ 201, 203, 204 and 206 and 251.

23. This Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367 because all claims set forth herein arise from the same nucleus of operative facts.

24. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, omissions, and network routing infrastructure giving rise to these claims is located within this District.

25. Each Defendant is registered to transact business in Maine, is organized or certificated in Maine and conducts its local exchange operations there. Each Defendant ordered and received the services at issue over facilities located in Maine.

## FACTUAL ALLEGATIONS

### A. The Parties' Legacy Arrangements and the 2007 Settlement Agreements

26. Fidium and its affiliates are successors in interest to the Northern New England local exchange operations formerly owned by Verizon New England, Inc., subsequently by FairPoint, and its affiliates, and thereafter by Consolidated Communications Holdings, Inc.

27. In 2007, in connection with the proceeding before the Maine PUC regarding FairPoint's acquisition of Verizon's Maine local exchange and long-distance assets, Docket No. 2007-00067, FairPoint entered into a series of substantially identical Settlement Agreements and Limited Mutual Releases with the incumbent local exchange carrier ("ILEC") members of the Telephone Association of Maine ("TAM"), including predecessors of the Defendants (the "2007 Settlement Agreements").

28. In 2017, in connection with the merger of FairPoint Communications, Inc. into Consolidated Communications Holdings, Inc., Maine PUC Docket No. 2016-00307, the parties' predecessors entered into a Stipulation dated May 23, 2017 (the "2016 Merger Stipulation").

29. Paragraph 33 of the 2016 Merger Stipulation provided that, for a period of thirty (30) months from the closing of the merger transaction (the "Agreement Extension Period"), Consolidated/FairPoint and the ILEC members of TAM would continue to honor and abide by the terms of the 2007 Settlement Agreements.

30. Paragraph 34 of the 2016 Merger Stipulation provided that, at any time after twenty-four (24) months from closing, at the option of either TAM's members or Consolidated/FairPoint, the parties would enter into discussions to address the treatment of certain terms and conditions of the 2007 Settlement Agreements "for the purpose of updating those Agreements to reflect the current practices and regulatory landscape."

31. Section 1(a) of the 2007 Settlement Agreements provided that FairPoint and the rural local exchange carriers ("RLECs") would continue the identified Services on the same rates, terms and conditions after the merger for a period of five years (the "Service Period"), and that the Service Period would be automatically extended for successive one-year periods unless terminated by either Party on one hundred eighty (180) days' advance written notice to the other Party.

32. Section 1(b) provided that, after the merger, the parties would cooperate and negotiate in good faith to review the then-current rates, terms and conditions of each Service and to reach a mutual agreement as to the future rates, terms and conditions of each such Service.

33. Section 1(c) provided that disputes arising with respect to the Services — either under the existing arrangements described in subparagraph (a) or under any new agreement reached in accordance with subparagraph (b) would be subject to the jurisdiction of the Maine PUC. By its terms, that provision reaches only disputes under the Settlement Agreement itself or under a successor agreement negotiated pursuant to subparagraph (b). The Settlement Agreements have been terminated, and no successor agreement was ever reached under subparagraph (b). Section 1(c) therefore has no application to the claims asserted here.

34. Section 9 of the 2007 Settlement Agreements, captioned "Merger and Integration," provided that the agreement contained the entire agreement between the parties with regard to the Services, and that there were no representations or warranties between the parties relating to the

parties' future provision or receipt of telecommunications services or infrastructure sharing except to the extent set forth in Section 1. Because Section 1 no longer applies to any service between the parties, no representation or warranty of any kind survives as to the pricing, terms or conditions of service after termination.

35. Nothing in the 2007 Settlement Agreements or the 2016 Merger Stipulation committed Fidium to extend the pricing, rates, or service terms of the 2007 Settlement Agreements perpetually, or to continue those terms in the absence of a successor agreement.

**B. Termination of the 2007 Settlement Agreements**

36. By letter dated August 23, 2023, addressed to the TDS Telecom Access Service Center and signed by its Senior Vice President – Legislative and Regulatory, Fidium gave TDS, both directly and on behalf of its subsidiaries, including the TDS Operating Company Defendants the one hundred eighty (180) days' advance written notice of termination of the Service Period required by the Settlement Agreements. A true and correct copy of that letter is attached hereto as Exhibit A.

37. The August 23, 2023 letter stated that, effective February 19, 2024, Consolidated would no longer continue to provide services to TDS and its affiliates in accordance with the rates, terms and conditions of the Settlement Agreement. TDS has acknowledged receipt of that notice and the 180-day notice period.

38. The August 23, 2023 letter further advised TDS that, over the ensuing 180 days, Consolidated would work with TDS to transition circuits into the billing systems as necessary, and that the June 2023 invoice would be the last invoice reconciled, with invoices issued from July 2023 through the February 19, 2024 termination date reflecting the services in effect as of June 2023.

39. TDS therefore had at least 180 days' written notice that the circuits and services it was taking from Fidium would be transitioned into Fidium's billing systems and billed to TDS, and that the pricing of the terminated Settlement Agreements would no longer apply after February 19, 2024.

40. Despite Fidium's good-faith attempts, Fidium and TDS thereafter did not reach a replacement wholesale services agreement.

41. From and after February 19, 2024, TDS had no contractual right to receive service from Fidium at the pricing, terms or conditions of the terminated 2007 Settlement Agreements.

42. From and after February 19, 2024, the rates, terms and conditions applicable to the services TDS continued to take from Fidium were supplied by Fidium's published and filed offerings: Service Guide No. 3 for interstate BDS services, the Consolidated Communications Companies Tariff FCC No. 7 for interstate switched access services, and Fidium's filed state schedules for intrastate services.

**C. The Services Fidium Furnished to TDS**

**1. Interstate Special Access/BDS**

43. Fidium furnished TDS with interstate special access/BDS service billed to Maine billing account numbers. These were dedicated, point-to-point transmission services provided over dedicated facilities such as DS1 and DS3 circuits, connected to TDS's points of presence, and made available for TDS's exclusive use.

44. Special access/BDS services of this kind are furnished on a wholesale basis and have historically been regulated by the FCC as interstate access services under the FCC's access charge rules, 47 C.F.R. Part 69, including the special access element, 47 C.F.R. § 69.114, and the FCC's tariff rules, 47 C.F.R. Part 61. *See also Business Data Services in an Internet Protocol*

*Environment*, WC Docket No. 16-143, Report and Order, FCC 17-43, 32 FCC Rcd 3459 (Apr. 28, 2017) ("*Business Data Services Order*"), *remanded in part sub nom*., *Citizens Telecomms. Co. of Minn., LLC v. FCC*, 901 F.3d 991 (8th Cir. 2018), *on remand Business Data Services in an Internet Protocol Environment*, WC Docket No. 16-143, Report and Order on Remand and Memorandum Opinion and Order, FCC 19-66, 34 FCC Rcd 5767 (July 12, 2019) ("*Business Data Services Remand Order*").

45. Fidium offers some jurisdictionally interstate special access services, now sometimes known as BDS, under its Tariff FCC No. 7 filed with the FCC, and other jurisdictionally interstate BDS through its publicly available Service Guide No. 3, published at https://www.tariffs.net/consolidated/tier.asp?cid=3203.

46. A single BDS service may carry both traffic that is jurisdictionally interstate (*e.g.*, with one end within the state of Maine and the other end of the communication in a different state) and jurisdictionally intrastate (*i.e.*, with both the origin and termination of the communications within the state of Maine), even if both ends of the physical facility are within the same state. In such a case, the FCC regulates rates, terms, and conditions of the BDS if more than a *de minimis* portion (*i.e.*, at least ten percent of the total special access traffic on the line) is jurisdictionally interstate. Otherwise, the special access service is treated as jurisdictionally intrastate and subject to regulation by the Maine PUC. This approach is in accordance with well-established and understood rulings of the FCC, *see MTS and WATS Market Structure Amendment of Part 36 of the Commission's Rules and Establishment of a Joint Board*, CC Docket No. 80-286, Decision and Order, FCC 89-224, 4 FCC Rcd 5660 (Jun. 29, 1989). This is known as the "Ten Percent Rule."

47. For "Mixed-Use Special Access Service," that carries a mix of jurisdictionally interstate and intrastate traffic, Tariff FCC No. 7 places the burden of jurisdictional classification on the customer, even if the end points of the specific physical facility are in the same state.

48. Over time the FCC has granted pricing flexibility, forbearance, and relief from ex ante pricing regulation and tariffing requirements for many incumbent local exchange carriers' BDS offerings as the market for those services has grown more competitive. Those offerings remain jurisdictionally interstate and regulated by the FCC under Sections 201 and 202 of the Communications Act. In the *Business Data Services Order* and the *Business Data Services Remand Order*, the FCC deemed certain BDS offerings competitive, and ceased requiring FCC tariffing and ex ante price regulation for those BDS.

49. The introductory section of Fidium's Service Guide No. 3 defines its scope as follows: "As of the Effective Date the Federal Communications Commission has designated the certain counties in the states of Maine, New Hampshire and Vermont as Competitive. Special Access services provided by [Fidium] in their operating territories in the competitive counties listed below are governed by this Catalog. Additionally, transport and mileage-rated Special Access services provided by Consolidated Communications in counties deemed Non-Competitive in the States of Maine, New Hampshire and Vermont, are also governed by this Catalog, however Special Access End-User Channel Terminations are governed by Consolidated Communications FCC Tariff No. 7." Section A.2., states that Service Guide No. 3 applies to "Channel Terminations including End User Channel Terminations deemed Competitive by the Federal Communications Commission . . . . Services contained in this Catalog were previously provided pursuant to tariffs on file with the Federal Communications Commission." "Channel Terminations" are a form of

special access generally regulated by the FCC. *See* 47 C.F.R. § 69.703(a); *Business Data Services Order* at ¶ 6.

50. In the *Business Data Services Order*" and "*Business Data Services Remand Order*," the FCC addressed tariffing and price regulation requirements for jurisdictionally interstate BDS/special access services under the Ten Percent Rule. Thus, those services governed by Service Guide No. 3 are likewise jurisdictionally interstate.

51. From and after February 19, 2024, when the 2007 Settlement Agreements terminated, the terms, conditions and pricing of a portion of the BDS circuits Fidium furnished to TDS were supplied by Fidium's publicly available BDS Catalog and Product Guide, Service Guide No. 3, together with Fidium's FCC tariff.

52. Fidium furnishes the same BDS services to more than thirty other carriers, including interexchange carriers, cable companies, and incumbent and competitive local exchange carriers in Maine, New Hampshire and Vermont. Each of those carriers is billed and pays Fidium's BDS Catalog rates. TDS alone has refused to pay anything for these services.

53. Fidium's state access tariffs expressly adopt and concur with the BDS rates found in Fidium's FCC BDS tariffs and BDS Catalog. *See* Consolidated Tariff, Maine PUC Intrastate Access Tariff No. 2, § 2.1.

**2. Interstate and Intrastate Switched Access Service**

54. Fidium also furnished TDS with switched access service over 35 circuits billed to Maine billing account numbers. Switched access service uses Fidium's local exchange switches, tandem switches and interoffice transport to originate and terminate voice traffic to and from TDS's end users and interexchange carriers.

55. Switched access service may be jurisdictionally interstate or jurisdictionally intrastate depending on the end points of the call. *See, e.g.*, 47 C.F.R. Part 36; §§ 51.903 *et seq.*., *Louisiana PSC v. FCC*, 476 US. 355 (1986); *Smith v. Illinois Bell Tel. Co.*, 282 U.S. 133 (1930). Fidium's intrastate switched access rates are the same as its interstate switched access rates.

56. Fidium's interstate rates for these switched access services are set forth in the Consolidated Communications Companies Tariff FCC No. 7, Access Service, which has been on file and effective at all times relevant to this complaint. By way of example, § 31.6.1(C)(1)(b)-(c) of that tariff prescribes Direct Trunked Transport channel mileage rates for Maine, New Hampshire and Vermont of $70.00 fixed and $20.45 per mile monthly for DS1, and $825.00 fixed and $161.25 per mile monthly for DS3.

57. Fidium's intrastate schedule, PUC ME No. 1, Access Service, Section 30 (Rates and Charges), sets out the intrastate switched access rate elements, including § 30.6.9 (Direct Trunked Transport). That schedule was issued February 18, 2020, became effective March 19, 2020, and was filed in Commission Docket No. 2020-00057. It has remained on file with the Maine PUC and in effect at all times thereafter. Each rate in § 30.6.9 is marked with an asterisk denoting that the rates, charges and conditions for the provision of intrastate terminating Carrier Access Service are as specified in the Consolidated Communications Companies Tariff FCC No. 7, as it now exists and as it may be revised, added to or supplemented.

58. The pricing of the switched access circuits is therefore the same whether a given circuit is jurisdictionally interstate or intrastate.

59. The Defendants are the only incumbent local exchange carriers in Northern New England that have refused to pay Fidium's published rates. Every other RLEC taking service from Fidium in Northern New England takes intrastate switched access service and interstate BDS

service at Fidium's published prices. Were Fidium to accept from Defendants anything less than its tariffed switched access rates, it would be extending to Defendants privileges and charging compensation different from that charged to similarly situated carriers, in violation of 47 U.S.C. §§ 202(a) and 203(a), (c). With respect to BDS, Fidium has uniformly applied the same catalog rates to all carriers, and accepting a different rate from Defendants alone would constitute unjust discrimination under 47 U.S.C. § 202(a). see, e.g., *American Tel. & Tel. Co. v. Central Office Tel., Inc*., 524 U.S. 214, 226 (1998).

60. On June 16, 2026, in response to a procedural order, TDS filed in Maine PUC Docket No. 2026-00115 a schedule of circuits identifying, for each circuit, the TDS and Fidium CLLI codes, the circuit identifier, the parent transport layer, the April 2026 monthly recurring charge, the traffic type, and the ownership. For Somerset Telephone Company alone (Account 207 S12-0120 012), TDS identified circuits carrying traffic types including "Local/EAS, IXC, Toll, Toll Free, 911" and "Special Access," all designated "Joint Use." TDS thereby acknowledged the circuits, the services, the charges and the traffic they carried.

61. TDS originally ordered each of the circuits at issue, accepted delivery of the services, continued to use the services after the termination of the 2007 Settlement Agreements, and billed and collected revenue from its own end users and from interexchange carriers for services that depended on Fidium's facilities.

**D. Fidium's Circuit Audit and the October 2025 Billing**

62. Under the terminated 2007 Settlement Agreements, individual circuits were not billed to TDS. Those agreements carried over from Verizon New England an outdated arrangement under which FairPoint and its successors billed very low frozen and outdated rates and offset the billing by outdated assumptions on the reciprocal billing by TDS. Billing TDS circuit by circuit was new only because the legacy arrangement under which no circuit was billed had ended.

63. Fidium began billing TDS in February 2024 published amount for each Fidium circuit TDS had in place, invoicing approximately 76 circuits.

64. Prompted by that inquiry, Fidium audited all TDS BDS circuits to confirm they were being properly invoiced. The audit identified approximately 86 additional BDS circuits that TDS ordered, that were connected and in service for TDS's use, but that were not being invoiced to TDS. Including those circuits, Fidium was providing TDS with a total of approximately 132 BDS circuits.

65. Fidium informed TDS of the results of the circuit audit in August 2025.

66. In October 2025, after disclosing the audit results to TDS, Fidium began invoicing TDS for all of the BDS circuits serving TDS, including those identified in the audit. Through subsequent communications TDS cancelled additional circuits it no longer required, and Fidium issued credits for those circuits from the date of disconnection.

67. At no time did TDS dispute that it had originally ordered, or that it was the customer of record on, the circuits at issue.

68. Beginning in October 2025, Fidium and TDS held weekly meetings concerning Fidium's provision of BDS and switched access services and TDS's refusal to pay for them. Between October 2025 and the filing of TDS's Commission complaint, TDS disconnected 49 interstate circuits without paying for any of the services it had taken over them.

**E. The Billing Accounts, Invoices, and Unpaid Balances**

69. Plaintiff has lawfully filed and maintained valid tariffs with the FCC for interstate access elements and with the Maine PUC for intrastate access elements, including the Consolidated Communications Companies Tariff FCC No. 7 and Fidium Tariff Puc ME No. 1, Access Service (eff. March 19, 2020), which specifically govern Intercarrier Access, Tandem Switching and

Trunking. Each of the FCC tariffs was filed on a "deemed lawful" basis in accordance with Section 204(a)(3) of the Communications Act of 1934, as amended, and 47 C.F.R. Part 61.

70. Defendants have accepted the full operational benefit of Plaintiff's infrastructure but have failed to pay the lawful charges, accumulating a total delinquent balance of $5,460,443.05 on Maine billing account numbers.

71. Fidium billed TDS monthly for the services described above under the billing account numbers ("BANs") which also identifies the TDS billing entity, the service category, the number of circuits, and the amount due as of September 1, 2026:

72. Each invoice stated the services furnished, the applicable rate, the amount due, and the payment due date. Late payment charges accrue on unpaid balances at the rate specified in the applicable service guide or tariff.

73. TDS received each invoice. TDS did not pay any of them, in whole or in part. TDS has not paid Fidium even the portion of the billed amounts that TDS does not dispute.

74. The amounts due from TDS on Maine billing account numbers as of September 1, 2026, are as follows:

| **Service Category** | **Amount Due** |
|---|---|
| Interstate special access / business data services (BDS) | $2,856,074.71 |
| Switched access services | $2,604,368.34 |
| **TOTAL — Maine** | **$5,460,443.05** |

75. These amounts are exclusive of late payment charges, interest, and the costs of collection.

76. The amounts pleaded in this Complaint are the amounts billed to TDS on Maine billing account numbers. In addition to the Maine amounts, TDS owes Fidium substantial balances

for special access/BDS and switched access services billed to New Hampshire and Vermont billing account numbers, such that TDS's total unpaid balance to Fidium across Maine, New Hampshire and Vermont is approximately $9,356,914 as of September 1, 2026. Fidium seeks recovery of the Maine billing account balances in this action and expressly reserves all rights to recover the New Hampshire and Vermont balances, together with late payment charges, interest and costs, in this or any other forum.

**F. The April 7, 2026 Notice of Default and Fidium's Forbearance**

77. On January 19, 2024, approximately one month before the terminations took effect, Fidium issued the TDS companies a follow-up memorandum reminding them of the pending termination.

78. By April 7, 2026, TDS had accumulated an account receivable for Maine billing accounts with Fidium of $4,655,566, of which $1,666,952.94 was associated with the nine BDS circuits then remaining in service. It had become apparent that TDS had no intention of paying past or future invoices.

79. On April 7, 2026, Fidium served TDS with a Notice of Default and Opportunity to Cure, which identified TDS's non-payment, specified the amounts due, afforded TDS an opportunity to cure, and advised that services were subject to suspension if TDS did not timely tender payment (the "April 7 Notice").

80. TDS did not cure the default. TDS did not tender payment of any amount, disputed or undisputed.

81. Although the April 7 Notice threatened suspension of all services for non-payment, Fidium did not suspend the services. Fidium continued to furnish the circuits and services to TDS.

82. On April 29, 2026, Fidium extended the termination date for the BDS circuits from May 7, 2026, to June 5, 2026. On May 13, 2026, Fidium further extended the termination date to June 26, 2026.

83. On April 27, 2026, rather than pay for the services, TDS filed a Complaint and Request for Investigation, Division of Charges, and Temporary Order with the Maine PUC, docketed as Docket No. 2026-00115, seeking among other things a temporary order enjoining Fidium from terminating or suspending service.

84. On June 30, 2026, the Maine PUC denied TDS's request for a temporary order, finding that the dispute between TDS and Fidium is "financial in nature" and that TDS had failed to demonstrate irreparable harm from termination of service.

85. Fidium terminated two BDS circuits in Maine on July 7, 2026. The remaining BDS and switched access circuits in Maine continued in service until after the Commission's injunction expired.

86. On July 27, 2026, Fidium issued a notice stating that it would disconnect the remaining circuits then being used by TDS in Maine on August 26, 2026.

87. On August 10, 2026, TDS requested a temporary order from the Maine PUC staying the termination for fifteen days. On August 17, 2026, Fidium responded, opposing the request and offering, in the alternative, to grant the requested fifteen-day extension if TDS paid $157,209 – the published rate for the final month of services -- with full reservation of rights. TDS rejected that offer and paid nothing.

88. On August 26, 2026, the Maine PUC denied TDS's request for a fifteen-day stay but enjoined Fidium from disconnecting the identified facilities until 12:00 noon on September 1, 2026, and directed TDS to report by August 31, 2026, whether all 911 traffic had been successfully

transitioned to other carriers. In that Order the Commission observed that TDS may have used the risk of a loss of 911 service, and the associated risk to human health and safety, as a tool to leverage the Commission and thereby afford TDS an advantage in its commercial dispute with Fidium.

89. The footnote in the Commission's Order of August 26th, 2026, at page 4 states as follows: "It appears that TDS may have used the risk of a loss of 911 service, and the associated risk to human health and safety, as a tool to leverage the Commission and thereby afford TDS an advantage in its commercial dispute with Fidium. The pattern of behavior by TDS in this matter does not suggest good faith, which, by itself, argues in favor of a potential separate investigation by the Commission into the acts and practices of TDS."

90. Effective August 24, 2026, TDS moved its 911 traffic in Maine to Bandwidth.com CLEC, LLC and transitioned its non-911 traffic and transport in Maine, New Hampshire and Vermont to Onvoy, LLC d/b/a Sinch.

91. On August 31, 2026, TDS filed a report with the Maine PUC, attested by TDS's Senior Vice President – Corporate Affairs, stating that its 911 traffic had been successfully transitioned and tested and that 911 service to its customers was fully available through the new carrier.

92. The Maine PUC's injunction expired at 12:00 noon on September 1, 2026. Fidium thereafter proceeded to terminate the TDS circuits in Maine.

93. Between April 7, 2026, and the respective termination dates — July 7, 2026 for the two Maine BDS circuits, and after 12:00 noon on September 1, 2026, for the remaining Maine circuits — Fidium continued to furnish service to TDS for which TDS paid nothing.

94. The Defendants are no longer customers of Fidium in Maine, New Hampshire or Vermont for these services. What remains is the account receivable Fidium holds for the interstate

and intrastate services it furnished to TDS in Maine, New Hampshire and Vermont, which totals approximately $9,356,914, of which the Maine billing account balances sought in this action total $5,460,443.05 and the balance of which is attributable to New Hampshire and Vermont billing account numbers as to which Fidium reserves all rights.

### G. Demand and Refusal

95. Fidium has demanded payment from TDS on numerous occasions, including through monthly invoices, collection communications, the April 7 Notice, the July 27, 2026 termination notice, and its filings in Maine PUC Docket No. 2026-00115.

96. TDS has refused, and continues to refuse, to pay Fidium any amount for the services it ordered, accepted and used.

97. All conditions precedent to Fidium's right to recover have occurred, been performed, or been waived.

## COUNT I
## VIOLATION OF THE COMMUNICATIONS ACT AND FILED TARIFFS
## (47 U.S.C. §§ 201, 202, 203)

98. Fidium repeats and realleges each preceding paragraph as though fully set forth herein.

99. Fidium is a common carrier engaged in interstate communication by wire within the meaning of 47 U.S.C. §§ 152(a) and 153(11).

100. The special access/BDS services and the interstate portion of the switched access services Fidium furnished to Defendants are jurisdictionally interstate telecommunications services subject to Title II of the Communications Act, including Sections 201 and 202. The switched access services remain subject to the tariffing requirements of 47 U.S.C. § 203; the BDS services, while subject to 47 U.S.C. § 201(b), are furnished under Fidium's published Service

Guide No. 3 following the FCC's grant of pricing flexibility and forbearance from tariffing requirements.

101. Under 47 U.S.C. § 203(c), no carrier may extend to any person any privileges or facilities in interstate communication except those specified in its filed schedules, and no carrier may charge, demand, collect or receive a greater, less or different compensation for interstate communication service than the charges specified in its filed schedules.

102. Under the filed rate doctrine, the filed rate is the only lawful rate; it binds carrier and customer alike; and neither a customer's dissatisfaction with the rate nor a carrier's willingness to forgo it can alter the customer's obligation to pay it. *See AT&T Co. v. Central Office Telephone, Inc.*, 524 U.S. 214, 222-23 (1998); *Maislin Indus., U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126-28 (1990); *Louisville & Nashville R.R. v. Maxwell*, 237 U.S. 94, 97 (1915).

103. The BDS circuits Fidium furnished to Defendants are jurisdictionally interstate services. Under Fidium's published methodology, and as directed by the FCC, a special access/BDS circuit is categorized as jurisdictionally interstate BDS if more than ten percent of the traffic carried on it is interstate. Because of the significant federal surcharges associated with interstate service, a circuit is categorized as intrastate only if the customer submits a written certification that less than ten percent of the traffic is interstate.

104. The Defendants never submitted such a certification for any circuit at issue, and until this dispute arose the Defendants never challenged the jurisdictional classification of the service. The circuits are therefore interstate.

105. The rates, terms and conditions on which the interstate BDS circuits were furnished are those of Fidium's publicly available BDS Catalog and Product Guide, which the Defendants

accepted by ordering and continuing to take the services, and which govern their payment obligation.

106. To the extent the services Fidium furnished to Defendants were provided under Fidium's federal tariffs, including the Consolidated Communications Companies Tariff FCC No. 7 and the Direct Trunked Transport rate elements at § 31.6.1(C)(1) thereof, the Defendants are obligated to pay the filed rates for those services, and Fidium is prohibited by 47 U.S.C. § 203(c) from charging the Defendants anything less. Fidium filed those tariffs at the FCC on a "deemed lawful" basis.

107. Section 202(a) of the Communications Act makes it unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, or to give any undue or unreasonable preference or advantage to any particular person or to subject any particular person to any undue or unreasonable prejudice or disadvantage. Fidium furnishes the same interstate special access/BDS and switched access services, over the same categories of facilities and under the same published BDS Catalog and filed tariff rates, to more than thirty other carriers in Maine, New Hampshire and Vermont, cable operators and competitive local exchange carriers. The services Fidium furnished to the Defendants are like services, furnished to a like class of carrier customers, under like conditions.

108. As telecommunications carriers, as defined in Section 3 of the Communications Act, 47 U.S.C. § 153, the Defendants are also subject to Section 202 of the Communications Act. It is an unjust and unreasonable practice, in violation of Section 202(a), for the Defendants to accept services from Fidium, incorporate them into their own services for sale to the Defendants' customers, and refuse to pay the lawful rates owed to Fidium for the input services it provides.

109. Every one of those similarly situated carriers pays Fidium's published BDS Catalog and filed tariff rates for the services it takes. The Defendant alone have refused to pay those rates, while continuing to order, accept and use the identical services. There is no cost, technical, or other neutral justification for charging Defendants a different, lesser, or no rate for like service furnished under like condition.

110. Were Fidium to accept from Defendants anything less than the published BDS Catalog and filed tariff rates that it charges and collects from every other similarly situated carrier, Fidium would be affording Defendants an undue and unreasonable preference and advantage and subjecting the paying carriers to an undue and unreasonable prejudice and disadvantage, in violation of 47 U.S.C. § 202(a). The filed rate doctrine and § 202(a) thus operate together: Fidium is not merely entitled to collect its published and filed rates from Defendants — it is prohibited from collecting anything less.

111. To the extent the FCC has forborne from applying the tariffing requirements of 47 U.S.C. § 203 to Fidium's business data services, those services are furnished under the published rates, terms and conditions of Service Guide No. 3, which Defendants accepted by ordering and taking the services, and which govern Defendants payment obligation. Even though the FCC has forborne from the tariff filing requirement for those BDS, they remain jurisdictionally interstate and regulated by the FCC under other provisions of Title II of the Communications Act of 1934, as amended, including 47 U.S.C. §§ 201-202.

112. Under 47 U.S.C. § 201(b), all charges and practices in connection with interstate communication service must be just and reasonable. Defendants conduct in ordering interstate access services, taking them continuously for years, using them to generate their own revenues,

and then refusing to remit any payment whatsoever — including any undisputed amount — constitutes an unjust and unreasonable practice in violation of 47 U.S.C. § 201(b).

113. A carrier's recovery of charges for interstate service furnished under its filed federal tariff or published service guide is governed by federal law, and Defendants may not avoid that obligation by disputing the rate after the fact, by demanding rates from a terminated settlement agreement, or by invoking a state regulatory proceeding.

114. As a direct and proximate result of Defendants violations, Fidium has been damaged in the amount of not less than $2,856,074.71 for interstate special access/BDS service billed to Maine billing account numbers, including charges assessed under Fidium's published BDS Catalog (Service Guide No. 3) and, to the extent any such services remain tariffed, under Fidium's filed federal tariff, plus the interstate portion of the $2,604,368.34 billed for switched access service, together with late payment charges, interest, and costs, in an amount to be proven at trial.

**COUNT II**
**VIOLATION OF MAINE FILED TARIFFS AND THE MAINE PUBLIC UTILITIES LAW**
**(35-A M.R.S. §§ 301, 307, 309)**

115. Fidium repeats and realleges each preceding paragraph as though fully set forth herein.

116. Fidium is a public utility subject to Title 35-A of the Maine Revised Statutes with respect to the intrastate telecommunications services it provides in Maine.

117. Fidium maintains on file with the Maine PUC schedules showing the rates, terms and conditions applicable to the intrastate services it furnishes in Maine, including Fidium Tariff Puc ME No. 1, Access Service (eff. March 19, 2020). Section 30 of Puc ME No. 1 provides that the rates, charges and conditions for the provision of intrastate terminating Carrier Access Service

are as specified in the Consolidated Communications Companies Tariff FCC No. 7, as it now exists and as it may be revised, added to or supplemented. In addition, § 2.1 of Consolidated Tariff, Maine PUC Intrastate Access Tariff No. 2, expressly adopts and concurs with the BDS rates found in Fidium's FCC BDS tariffs and BDS Catalog.

118. Under 35-A M.R.S. § 307, a public utility must file with the Commission schedules showing all rates and charges for service, and under 35-A M.R.S. § 309(1) a public utility may not charge, demand, collect or receive a greater or less or different compensation for any service than the rates and charges specified in the schedules on file and in effect.

119. The Maine PUC applies the filed rate doctrine to compel payment of tariffed charges and holds customers to constructive notice of the contents of a filed schedule whether or not they have actual notice of it. *See David E. Kohler v. Central Maine Power Co.*, Docket No. 98-146, Order Denying Appeal (Mar. 18, 1998); *Randall Cushman, Appeal of Consumer Assistance Division Decision #2002-14860 Regarding AT&T Communications*, Docket No. 2003-00901, Order at 2 (Apr. 12, 2004). That doctrine applies with no less force to TDS, itself a regulated Maine utility that is thoroughly familiar with approved tariffs.

120. Following the termination of the 2007 Settlement Agreements and the absence of any replacement commercial agreement between the parties, Fidium's filed Maine schedules supplied the rates, terms and conditions governing the intrastate services Defendants continued to take from Fidium, as required by 35-A M.R.S. § 309, which permits no deviation from the rates and charges specified in the schedules on file.

121. Fidium billed Defendants for those intrastate services at the rates set forth in its filed Maine schedules and at no other rate.

122. Defendants have taken advantage of and benefited from those services and have refused to pay the filed rates, in violation of 35-A M.R.S. § 309(1) and the filed rate doctrine.

123. Fidium is entitled to recover from Defendants the full amount of the filed Maine rates for the intrastate services Defendants took, together with late payment charges, interest and costs.

124. As a direct and proximate result of Defendants conduct, Fidium has been damaged in an amount not less than the intrastate portion of the $2,604,368.34 billed for switched access service on Maine billing account numbers, together with late payment charges, interest, and costs, in an amount to be proven at trial.

**COUNT III**
**BREACH OF CONTRACT AND ACCOUNT STATED**

125. Fidium repeats and realleges each preceding paragraph as though fully set forth herein.

126. By ordering, accepting and continuing to take service from Fidium after February 19, 2024, Defendants entered into enforceable agreements to pay for those services at the rates, terms and conditions set forth in Fidium’s then-effective published and filed offerings, including Service Guide No. 3, which was publicly available and of which Defendants as sophisticated telecommunications carriers, had actual or constructive notice.

127. Fidium fully fulfilled its obligations by furnishing the services Defendants ordered, in the quantities and at the locations TDS specified, continuously and without interruption through July 7, 2026, for the BDS circuits and through September 1, 2026, for the remaining switched access circuits.

128. Fidium rendered periodic statements of account to Defendants reflecting the services furnished and the amounts due. Defendants retained those statements without payment of any amounts whatsoever.

129. Defendants breached their payment obligations by failing and refusing to pay any part of the amounts due.

130. As a direct and proximate result of Defendants breach, Fidium has been damaged in an amount not less than $2,856,074.71 for BDS services billed to Maine billing account numbers under Service Guide No. 3 and, in the alternative, in the full amount of $5,460,443.05 including switched access services, together with late payment charges, interest, and costs, in an amount to be proven at trial.

## COUNT IV
## QUANTUM MERUIT / UNJUST ENRICHMENT
## (Pleaded in the Alternative)

131. Fidium repeats and realleges each preceding paragraph as though fully set forth herein.

132. This Count is pleaded in the alternative, in the event it is determined that no tariff, service guide or enforceable contract governs some or all of the services at issue.

133. Fidium conferred a substantial benefit on Defendants by furnishing dedicated transmission capacity, switching, tandem access, and interoffice transport over Fidium's network facilities.

134. Fidium furnished those services with the reasonable expectation of being compensated, and Defendants ordered and accepted them with full knowledge that Fidium expected to be paid.

135. Defendants knowingly accepted and retained the benefit of those services. Defendants used them to serve their own end users, to carry traffic for which Defendants billed

interexchange carriers and end users, and to route traffic, including 911 and E-911 calls, that Defendants chose to transmit over Fidium's facilities.

136. The reasonable value of the services Fidium furnished is reflected in Fidium's published and filed rates, which Fidium charges to similarly situated carriers.

137. It would be inequitable and unconscionable for Defendants to retain the benefit of over two and a half years of services furnished after the 2007 Settlement Agreements terminated, and nearly five months of additional service furnished after its formal default, without paying Fidium anything.

138. Defendants have been unjustly enriched at Fidium's expense in an amount not less than $5,460,443.05 on Maine billing account numbers, in an amount to be proven at trial.

## COUNT V
## DECLARATORY JUDGMENT

139. Fidium repeats and realleges each preceding paragraph as though fully set forth herein.

140. An actual, substantial and justiciable controversy of sufficient immediacy exists between Fidium and Defendants concerning the rates, terms and conditions applicable to the services Fidium furnished to Defendants and Defendants' obligation to pay for them.

141. Defendants contend that it is entitled to the pricing, terms and conditions of the terminated 2007 Settlement Agreements, that Fidium's billing is unlawful, and that it owes Fidium nothing. Fidium contends that the 2007 Settlement Agreements were validly terminated effective February 19, 2024, that the parties failed to negotiate a successor agreement, and that Fidium's published and filed rates supply the governing terms.

132. Fidium is entitled to a declaration that:

(a) the 2007 Settlement Agreements were validly terminated and confer no continuing right on Defendants to the pricing, rates, or service terms that were the subject of those agreements;

(b) Section 1(c) of the 2007 Settlement Agreements does not apply to this dispute, because that provision reaches only disputes arising under the Settlement Agreements or under a successor agreement negotiated pursuant to Section 1(b), the Settlement Agreements have been terminated, and no successor agreement was reached; and that in any event the parties could not by private agreement confer on an administrative agency a jurisdiction the agency does not otherwise possess, {i}see *Girouard's Case*{/i}, 145 Me. 62, 65, 71 A.2d 682, 683 (1950); {i}*Stevenson v. Town of Kennebunk*{/i}, 2007 ME 55, ¶ 5 n.1, 930 A.2d 1046, 1048;

(c) the interstate special access/BDS services Fidium furnished to Defendants are interstate services subject to federal jurisdiction, governed by Service Guide No. 3 and Fidium's federal tariffs, and the rates for those interstate services are not subject to de novo rate-setting by any state commission;

(d) the rates, terms and conditions applicable to the services Fidium furnished to Defendants on Maine billing account numbers after February 19, 2024 are those set forth in Fidium's published and filed offerings; and

(e) Defendants are liable to Fidium for the amounts billed on Maine billing account numbers, together with late payment charges, interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Consolidated Communications of Northern New England Company, LLC d/b/a Fidium respectfully requests that this Court enter judgment in its favor and against Defendants, jointly and severally, as follows:

A. On Count I, awarding Fidium compensatory damages in an amount to be proven at trial, together with late payment charges and interest;

B. On Count II, awarding Fidium compensatory damages in an amount to be proven at trial, together with late payment charges and interest;

C. On Count III, awarding Fidium compensatory damages in an amount to be proven at trial, not less than $2,856,074.71 for BDS services billed to Maine billing account numbers under Service Guide No. 3 and, in the alternative, in the full amount of

$5,460,443.05 including switched access services, together with late payment charges and interest;

D. On Count IV, awarding Fidium the reasonable value of the services it furnished, in an amount to be proven at trial;

E. On Count V, entering a declaratory judgment as set forth above;

F. Awarding Fidium pre-judgment and post-judgment interest at the maximum lawful rate;

G. Awarding Fidium its costs of suit and its reasonable attorneys' fees, including as provided by 47 U.S.C. § 206, and to the extent otherwise permitted by the applicable service guide, tariff, contract or law; and

H. Granting such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Consolidated Communications of Northern New England Company, LLC d/b/a Fidium demands a trial by jury on all issues so triable.

Dated: September 14, 2026

Respectfully submitted,

CONSOLIDATED COMMUNICATIONS OF NORTHERN NEW ENGLAND COMPANY, LLC d/b/a FIDIUM

By its attorneys,

/s/ Mark V. Franco
Mark V. Franco, Bar No. 2967
Jeffrey T. Piampiano, Bar No. 9309
DRUMMOND WOODSUM
84 Marginal Way, Suite 600
Portland, ME 04101
(207) 772-1941
mfranco@dwmlaw.com
jpiampiano@dwmlaw.com